Also see Dunne v. State, 98 Tex. Cr. R. 7, 263 S. W. 615; King v. State, 104 Tex. Cr. R. 583, 286 S. W. 231, and authorities therein cited.

[2] The appellant also contends that the court was in error in limiting and restricting his charge on manslaughter to the acts and conduct of the deceased, instead of instructing the jury that they could take into consideration the acts and conduct of the deceased and those of his brother, Burrell Harvey, in determining the adequacy of the cause to provoke the manslaughter mind on the part of appellant. The court failed to charge the jury on the acts and conduct of Burrell Harvey on this issue, and this, we think, was error, as the record discloses that just a few days prior to the homicide it was he who used very opprobrious epithets towards the appellant in the town of San Augustine, and who struck the appellant's son over the head with an automobile pump at the time of the homicide, and who was one of the principal actors in said affray. In view of this condition of the record, we are of the opinion that the court's failure to charge on the acts and conduct of Burrell Harvey, in connection with those of the deceased, was reversible error. House v. State, 75 Tex. Cr. R. 338, 171 S. W. 206; Claxton v. State (Tex. Cr. App.) 288 S. W. 449, on rehearing.

For the errors above discussed, we are of the opinion that the judgment of the trial court should be reversed and remanded, and it is accordingly so ordered.

PER CURIAM. The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the court.

---

### OPPENHEIMER et al. v. MATCEK.*
### (No. 7664.)

(Court of Civil Appeals of Texas. San Antonio. Dec. 22, 1926. Rehearing Denied March 2, 1927.)

**1. Brokers ⧉⇒55(1)—Broker who introduced purchaser held not entitled to commission, where negotiations failed and another broker brought about sale.**

Real estate broker *held* not entitled to commission on sale of land, where he introduced landowner to prospective purchaser, but the parties then failed to agree upon sale because of price and another broker brought about agreement and sale two months later.

**2. Brokers ⧉⇒55(1)—Agreement of owner assuming charge of negotiations to pay broker commission held not to authorize recovery, where negotiations failed and another brought about sale.**

That landowner promised to pay commission to broker on all lands sold to prospective purchaser introduced by him and assumed charge of negotiations *held* not to entitle broker to recover commission, where negotiations were unsuccessful, and sale to such prospective purchaser was brought about by another broker two months later.

Appeal from District Court, Bexar County; Robt. W. B. Terrell, Judge.

Suit by J. B. Matcek against Jesse D. Oppenheimer and others. From a judgment in favor of plaintiff, defendants appeal. Reversed and rendered.

Gaines, Quin, Harley & Gaines, T. T. VanderHoeven, and B. A. Greathouse, all of San Antonio, for appellants.

Dilworth & Marshall, of San Antonio, for appellee.

SMITH, J. Jesse D. Oppenheimer and associates own various lands in Atascosa and other nearby counties, which they desired to sell. J. F. Chupick is engaged in the business of buying lands in that region and colonizing them by selling in small tracts to others. J. B. Matcek is engaged in the real estate and live stock business. All the parties reside and have their offices in San Antonio.

About the 1st of July, 1924, Oppenheimer and his associates sold a tract of their Atascosa county land, known as the "Wallis tract," to Chupick for a consideration of $26,880. After the sale Matcek brought this suit against Oppenheimer and his associates for 5 per cent. of the purchase price, which he claimed as his broker's commission upon the sale. Upon the trial of the suit the jury found in response to special issues submitted to them that Oppenheimer agreed with Matcek that if the latter "would procure a purchaser for the Wallis tract at a price and upon terms acceptable" to Oppenheimer and his associates, that he "would receive a commission of 5 per cent. on the selling price of said property," and that Matcek did "procure a purchaser for the Wallis tract of land at a price and upon terms acceptable" to the owners. From a judgment rendered in response to this verdict, Oppenheimer and his associates have appealed.

We will state the case in the light most favorable to appellee, adopting as true all of his testimony, whether disputed or not, and giving effect only to such other evidence as appears undisputed in the record.

About the middle of April, 1924, appellee,

⧉⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted April 27, 1927.

being acquainted with appellant Oppenheimer, called on the latter and requested him to list his lands with appellee, which was done. Later on appellee learned that Chupick was in the market for lands near Jourdanton for colonization purposes, and with that information in mind again called on Oppenheimer, who told him he had several tracts of land near Jourdanton for sale, and considered it good for colonization purposes. Appellee then mentioned Chupick as a "prospect," and Oppenheimer said, "Go ahead; bring him in the office; no matter what we sell him, you will get your 5 per cent.; I will take care of you." Pursuing the matter, appellee brought Chupick to Oppenheimer's office and introduced them to each other, as they had not theretofore met, and Oppenheimer "put up to Mr. Chupick several tracts of land which he had previously listed with" appellee, and which were situated in Atascosa and Frio counties, including, it is inferred, the Wallis tract subsequently sold to Chupick. Several different tracts appealed to the latter, who said he "would look them over later; that he was very busy then, and did not know just when he would have time to look them over"; that the Wallis tract appealed to him; that he would let Oppenheimer know later when he got ready. At this juncture in the negotiations, as stated in appellee's brief:

"Defendant Oppenheimer then informed the plaintiff that he would have a man show Mr. Chupick the land when Mr. Chupick got ready, and that he would take care of the plaintiff all right, and that whatever he sold Mr. Chupick, plaintiff would receive a 5 per cent. commission on the sale. Plaintiff further testified that upon the defendant Oppenheimer informing him that he (Oppenheimer) would take care of the matter of showing the land, and would take care of his commission if Mr. Chupick bought any of Oppenheimer's land, the plaintiff then left."

Quoting further from appellee's brief:

"The plaintiff further testified that when he brought Mr. Chupick in to see Mr. Oppenheimer, they (Chupick and Oppenheimer) had never met before, and that he presented them to each other as strangers, one to the other. The plaintiff further testified on redirect examination that at the time Mr. Oppenheimer told him about the land in question and offered to pay plaintiff a 5 per cent. commission, that he (Oppenheimer) just told the plaintiff to bring a buyer in there and he (Oppenheimer) would sell him. 'Whatever he would sell him, he would pay me my commission on.' * * * 'He did not tell me at any particular price; he just said, 'Whatever I sell him, I will take care of you; you will get your 5 per cent. commission.' * * * 'Then, after I brought Mr. Chupick in and looked at the map and descriptions of the land in Mr. Oppenheimer's office, Mr. Oppenheimer again told me that he would take care of me, and he said, 'Go ahead; I will take care of you; I will have a man to show him the land when he gets ready to see it.' * * * 'That was after I had already brought Mr. Chupick over there.'"

This meeting ended appellee's connection with the negotiations between Oppenheimer and Chupick. He did not again mention the matter to either of them.

After the foregoing conversations appellee left Oppenheimer and Chupick, who continued their negotiations in appellee's absence, but these further negotiations amounted to no more than Oppenheimer fixing a price of $25 an acre upon the land, which Chupick considered as too high, and left the office. Chupick testified:

"They wanted $25 an acre, and I know 1 would not pay that, and I dismissed the idea of buying it and did not do anything further about it. * * * I did not consider the land any further because they wanted $25 an acre."

And although appellee was in Chupick's office two or three times after this meeting with Oppenheimer, he did not again mention the project to Chupick, nor to any one else, until after the land was sold two months later.

About a month later Chupick was in Pleasanton and asked his friend, President Smith of the First National Bank, about buying lands in the vicinity of Pleasanton. Smith told him of the Wallis ranch, but Chupick demurred to considering that tract, testifying:

"I told Smith I knew I could not buy it, that I could not trade with the Oppenheimers, and he said, 'I will go down there and talk with them.'"

It appears that Smith then went to San Antonio and discussed the matter with Oppenheimer, urging him to cut the price of the Wallis land to Chupick, who would colonize the land and help settle the county and thereby benefit the whole country. Smith desired no commission, his interest being that of the public good. He returned to Pleasanton, got in touch with Chupick, and showed him over the Wallis land, which he had not theretofore seen. Smith told him at this time that he could purchase the land from Oppenheimer at less than $25 an acre, and Chupick went to San Antonio and called on Oppenheimer, who told him that if Smith did not claim a commission he would sell the land to Chupick for $22.50 an acre. "I told him" Chupick testified, "I did not feel justified in paying that, and so the deal was off as far as Smith was concerned. I told them I would not buy it at the price," and the negotiations ended.

Chupick thought no more of the matter until some weeks later when he was approached by a real estate agent named Hill, who—

"told me he heard I wanted to buy some land, and asked me what about this Oppenheimer land. I told him they want too much money for it. I would not pay $22.50 an acre. He said, 'What will you pay'? I told him, 'Well; I have offered him $20, and if he would take $21, I might consider it.' Two days later he came

back with an option from Mr. Oppenheimer, in which he agreed to take $21 an acre for the land, and pay him 50 cents an acre commission, and while Mr. Hill was in the office, Mr. Oppenheimer rang for me to come to his bank, that he wanted to see me. As to what date it was that I had negotiations with Mr. Hill, I will state that it was about two or three days before we closed the contract. I think that was about the middle of June, 1924. Mr. Oppenheimer called me to the bank, and when I got to the bank, Mr. Oppenheimer showed me a carbon copy of the option he had given Mr. Hill. That option called for $21 an acre net to him, and 50 cents an acre commission to Mr. Hill, the agent. Mr. Oppenheimer then told me, 'If you want to buy this land, I will sell it to you at $21 an acre.' I told him, 'Mr. Oppenheimer, Hill has been trying to buy this land for us.' He said, 'If that is the case, I will have to pay the commission anyway.' I said, 'If you will do this, I will buy it direct from you and pay Hill 50 cents an acre, and it will simplify matters if you handle it in that way.' And that is the way we made the trade, and I agreed I would pay Hill the 50 cents an acre commission. * * * The terms of that agreement were complied with, and I afterwards purchased the land at $21 an acre, and paid 50 cents an acre commission to Mr. Hill. That commission amounted to $640 and some odd dollars. I had no negotiations at all with Mr. Matcek after he first took me over there, and the proposed trade between me and them at that time was never carried out. I knew at the time I was in the office with Mr. Matcek and Mr. Oppenheimer that we could not trade with him, and so we just left there, and there was nothing more said about it. I took up Mr. Hill's option and paid the purchase price for the land, which was $21 an acre to Mr. Oppenheimer and 50 cents an acre to Mr. Hill."

[1] We hold as a matter of law under the foregoing facts that appellee was not entitled to a commission on the sale. If the sale had resulted as a consequence of appellee's introduction of the parties, even though the negotiations had been carried on and completed, by the seller, or even by other agents, without aid from appellee, the latter would have been entitled to his commission under the agreement made. But the sale did not result from those negotiations, either directly or remotely, for those negotiations served only to impress the parties that they could not agree, and the "prospect" thereupon lost interest in the land, abandoned any intention he may have had of making the purchase, and subsequently proceeded to look about for other lands. About a month later, in his quest for other lands, he met Smith, the banker, and asked him about lands for colonization in Smith's vicinity. Smith, knowing nothing of the earlier and fruitless negotiations, suggested the Wallis ranch, but Chupick rejected the suggestion; he did not care to renew negotiations with Oppenheimer. Smith, however, being anxious to see the land put on the market in small tracts, upon his own initiative, went to San Antonio and urged Oppenheimer to fix a lower price on the lands, and the latter agreed to reduce the price to $22.50 an acre. Smith, still acting on his own initiative, persuaded Chupick against the latter's inclination to see Oppenheimer with the view of securing a better offer, which Chupick did. But Oppenheimer stood upon the price of $22.50, and Chupick, refusing to pay that price, again lost interest in the matter. Two weeks or more later Hill, another agent, approached Chupick, got him interested, visited Oppenheimer, secured an option at $21.50 an acre, out of which he was to receive 50 cents an acre commission, and through further negotiations effected the sale. Under his contract with Oppenheimer he made the sale, and was paid his commission out of the sale price fixed by Oppenheimer. After Oppenheimer conveyed the land to Chupick in pursuance of this sale, Matcek, appellee herein, demanded a commission of 5 per cent. based upon the negotiations attending his introduction of the owner and purchaser some two months before.

The record presents a series of three separate and distinct negotiations, neither of which related to nor was in consequence of either of the others. The first negotiation was initiated by appellee, but it came to naught and was completely abandoned. The second was initiated by Smith without knowledge of the first, was in fact at first rejected by Chupick because of the futility of the first, but which, being revived and pressed to a conclusion, failed and was abandoned. The third was initiated by Hill without reference to or apparent knowledge of the first and second, and was pressed to a successful conclusion by Hill, who earned and was paid a commission for his successful efforts. It is obvious that under the most liberal interpretation of his contract appellee had nothing whatever to do with the sale of the land; no incident of its procurement is traceable to any act or influence of appellee. His introduction of the parties, which as a practical matter was the measure of his efforts, and the negotiations resulting from that introduction, were not only futile but were in a sense prejudicial in that they handicapped the subsequent efforts of Smith to get the parties together as an original proposition initiated by him, and caused Chupick to hesitate before entering into the negotiations initiated by Hill. In holding that appellee was not entitled to recover we adopt some of the authorities cited by appellant: English v. William George Realty Co., 55 Tex. Civ. App. 137, 117 S. W. 996; Edwards v. Pike, 49 Tex. Civ. App. 30, 107 S. W. 586; Walker v. Van Valkenberg, 291 S. W. 936, decided by the Austin Court of Civil Appeals, Nov. 10, 1926; Duval v. Moody, 24 Tex. Civ. App. 627, 60 S. W. 269.

[2] The facts that the landowner, upon being introduced to the prospective purchaser by appellee, excused the latter from the conference, agreed that he would pay appellee a

commission for whatever land the owner might sell the "prospect," and himself assumed charge of the negotiations, do not affect the case made by the record. This agreement was necessarily limited to sales made as a consequence of the negotiations set in motion by appellee's introduction of the parties. It cannot be construed to extend indefinitely into the future and to apply to sales made months later as a result of other negotiations initiated by other agencies independent of and wholly unrelated to the negotiations resulting from the act of introduction. Appellee had no exclusive agency, for the lands were listed with other agencies, one of which subsequently effected the sale. When the negotiations set in motion by appellee failed and were wholly abandoned by the parties as a result of the failure, and no other negotiations were subsequently had between the parties as a consequence of that first meeting, appellee's preference right to a commission ended, and the right of all other brokers to earn the commission was restored to an equality with that of appellee. Thereafter the race among the agents, including appellee, was to the vigilant. The subsequent efforts of Smith, as a volunteer agent, failed, but the efforts of Hill, two months after the failure of the negotiations initiated by appellee, were successful. He earned and received the commission. Appellee earned it in no sense of the word, and is not entitled to recover it.

The judgment is reversed, and judgment is here rendered for appellants.